# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 3579 | **DATE** | 7/6/2010 |
| **CASE TITLE** | Edgewater Med Ctr vs. Rogan et al. | | |

**DOCKET ENTRY TEXT**

Defendants' Motion to Compel [43] is granted in part and denied in part.

■ [ For further details see text below.]   Notices mailed by Judicial staff.

## STATEMENT

Before the Court is Defendants Access Community Health Services, Inc. ("Access"), Vital Community Health Services, Inc. ("Vital"), Wessel Bengston, B. Macon Brewwe, George Chapas, Fred Cuppy, William Fruland, Roger Mays, John Mullen, David Shanahan and George Thoma's (collectively "Defendants") Motion to Compel Allegedly Privileged and Work Product Information from Debtor. For the following reasons, the Court grants in part and denies in part Defendants' motion to compel.

## BACKGROUND

This case is an adversary proceeding associated with the bankruptcy proceedings of Edgewater Medical Center ("EMC"), a hospital located in Chicago, Illinois. EMC is an Illinois not-for-profit corporation. (R. 54-2, Ex. 2, Amended Complaint, ¶ 2.) EMC's court-appointed custodian caused EMC to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, on February 25, 2002, and EMC continues to manage its estate as a debtor-in-possession pursuant to § 1117 of the Bankruptcy Code. On July 31, 2002, Judge Black of the Bankruptcy Court for the Northern District of Illinois entered an order in the bankruptcy case confirming that EMC's custodian has the power to control, exercise and/or waive EMC's attorney-client privilege. (R. 46-2, Ex. 3.)

| | Courtroom Deputy Initials: | KF |
|---|---|---|

On April 23, 2004, EMC filed this adversary proceeding against Access and Vital, not-for-profit corporations that were EMC's parent companies, and the individual defendants, directors of EMC or members of the board of directors or finance committees of Access and Vital. EMC's initial complaint alleged that Defendants breached their fiduciary duties to EMC by: (I) causing EMC to enter into a lease that contained terms disadvantageous to EMC; (ii) approving a loan to an out-of-state organization for purchase of a California hospital; (iii) approving payments and forbearances to out-of-state organizations for no consideration; (iv) approving management agreements with Peter Rogan's management companies; and (v) failing to terminate the management companies and pursue legal action against them. (R. 54-2, Ex. 1, Complaint.) The amended complaint alleges that Defendants breached their fiduciary duties to EMC by: (i) approving a multi-million dollar lease on terms that were disadvantageous to EMC; (ii) approving a $10 million loan to an out-of-state hospital that resulted in no benefit to EMC; (iii) approving a $3 million consulting contract on terms disadvantageous to EMC; (iv) approving the transfer of $1 million from a charitable foundation to an out-of-state corporation for no consideration or benefit to EMC; (v) approving management contracts with Rogan's management companies on terms disadvantageous to EMC; and (vi) abandoning their fiduciary role to monitor and ensure compliance in matters relating to EMC's legal and financial affairs. (R. 54-2, Ex. 2, Amended Complaint.) While the amended complaint challenges much of the same conduct by Defendants, it contains greater detail regarding those claims.

On August 15, 2005, Defendants filed a motion to compel a series of documents relating to legal advice given to Defendants while they were directors or committee members of the boards of directors of EMC and/or its affiliates. Specifically, Defendants requested the bankruptcy court to "order Edgewater to immediately produce all documents relating to legal advice provided to Defendants during their association with Edgewater, including all board minutes and all documents produced by McDermott, Will & Emery." (R. 54-2, EMC's Opp'n, Ex. 3, p. 2.) Defendants asserted that the bankruptcy court should reject EMC's privilege claims on the following five grounds: "(1) the advice was provided to Defendants and forms the basis for their 'advice of counsel' defense against Edgewater's claims, (2) the same counsel jointly represented Edgewater and the Defendants, (3) Edgewater has waived any privilege claim by putting the documents at issue in this litigation, (4) Edgewater has waived any privilege claim by producing a full set of unredacted board minutes to third parties, and (5) Edgewater cannot use the privilege as a shield and a sword." *Id.* Defendants did not assert in their 2005 motion to compel that EMC could not assert the privilege because the entity was defunct or because no privilege attached to certain communications due to the presence of third parties. On September 26, 2005, Judge Black denied Defendants' motion to compel with the exception of the following four items: (i) David Stetler's March 2000 presentation to the Access and Vital boards regarding the fact that the hospital and management company were indictable; (ii) David Stetler's advice at the April 2001 board meeting regarding the results of counsels' investigation and the March 2000 presentation; (iii) the advice of David Stetler and McDermott Will & Emery in the months prior to and including May 2001 to discharge the management companies and Mr. Rogan; and (iv) the May 9, 2000 advice of counsel referenced in paragraph 123 of the complaint to discharge Rogan and the management companies. (R. 54-2, Ex. 5., p. 2.)

In August 2008, EMC's counsel made documents produced by its attorneys available to Defendants' counsel for review, without prejudice to EMC's ability to assert privilege. After Defendants' counsel selected documents, in September 2009, EMC produced some documents and provided a privilege log as to others. In addition, in the summer of 2009, almost four years after Judge Black's ruling, Defendants sought to depose three former EMC attorneys: Robert Hoban of McDermott, Will & Emery, Richard Zimmerman of Foley & Larner, and David Stetler of Stetler & Duffy. EMC objected to the depositions on the basis of attorney-client privilege and, in some cases, the work product doctrine. In correspondence regarding the parties' discovery dispute, EMC asserted that Judge Black's 2005 privilege ruling controls.

In their motion, Defendants contend that the "law of the case doctrine" does not affect four of the five arguments presented for the first time in the instant motion to compel: (i) there is no privilege to assert because EMC is a defunct organization; (ii) privilege was waived from 1995-September 1998 because third parties were present when the communications were made; (iii) "at issue" waiver should encompass all legal advice given to Defendants about the transactions referenced in the complaint; and (iv) EMC's work product claims are meritless.

Defendants also argue that Judge Black's 2005 ruling does not bar reconsideration of whether a party can assert the privilege against directors who received the legal advice.

## LEGAL STANDARD

Because the Court has jurisdiction over this case based on diversity of citizenship and the claims in the complaint arise under Illinois law, Illinois law also governs the claims of attorney-client privilege. *Dexia Credit Local v. Rogan*, 231 F.R.D. 268 (N.D. Ill. 2004) (citing Fed. R. Evid. 501 and *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 139 (N.D. Ill. 1993)); *Favala v. Cumberland Eng'g Co.*, 17 F.3d 987, 989 (7th Cir. 1994). In defining the attorney-client privilege, the Illinois Supreme Court has stated that "where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal adviser, except the protection be waived." *Fischel & Kahn v. van Straaten Gallery*, 727 N.E.2d 240, 189 Ill. 2d 579, 584 (Ill. 2000). "The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Id.* "Moreover, 'the [attorney-client] privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.'" *Id.* (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981)).

Under Illinois law, it "is the [attorney-client] privilege, not the duty to disclose, that is the exception" and, therefore, "the privilege ought to be strictly confined within its narrowest possible limits." *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill. 2d 178, 200-201, 579 N.E.2d 322, 327 (Ill. 1991). Illinois courts accordingly "adhere to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Id.*

## ANALYSIS

### I.      Attorney-Client Privilege

As an initial matter, the Court has reviewed the parties' briefing and Judge Black's order on the initial motion to compel privileged documents. In many respects, the motion to compel presently before the Court is a motion for reconsideration. Because EMC has filed an adversary proceeding arising out of the bankruptcy proceedings against Defendants, the district court in which the bankruptcy case is pending constitutes the appropriate venue for the adversary proceeding. *See* 28 U.S.C. § 1409(a). The Court accordingly may reconsider an earlier ruling by Judge Black in the bankruptcy court. While the amended complaint filed in the adversary proceeding on March 6, 2008 contains significantly more detail that the initial complaint filed on April 23, 2004, both complaints challenge much of the same conduct and cover the same time period. Defendants argue that discovery since 2005 "has shown just how crucial legal advice was to all of the challenged decisions." (R. 58-1, Defs.' Reply, p. 4.)

The Seventh Circuit has said that a motion to reconsider is appropriate where: "(1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in law since the submission of the issue to the court; or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court." *Orange v. Burge*, 451 F. Supp. 2d 957, 961 (N.D. Ill. 2006) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationle de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996). The Seventh Circuit has repeatedly cautioned that "motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *See, e.g., Publishers Resource Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561

(7th Cir. 1985) (quotation omitted); *In re Oil Spill by "Amoco Cadiz,"* 794 F. Supp. 261, 267 (N.D. Ill. 1992) ("Motions to reconsider are not at the disposal of parties who want to 'rehash' old arguments"). Accordingly, "any arguments . . . raised for the first time in [a] motion to reconsider are waived." *Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009) (citation omitted).

> A. **Defendants Have Waived the Argument that EMC's Status as an Allegedly "Defunct" Entity Warrants Disclosure**

Defendants first argue that because EMC is defunct there is no privilege to assert. Defendants, however, could have raised this argument in their initial motion to compel which sought "all documents relating to legal advice provided to Defendants during their association with Edgewater." (R. 50-1, Case No. 04-2330, Bankruptcy Court for the Northern District of Illinois, pp. 1-2.) Defendants premise this argument on the fact that EMC ceased operations in December 2001 in the wake of the indictment of the hospital's management company and the Circuit Court of Cook County's February 2002 finding that "the Corporation is no longer able to carry out its purpose of operating a hospital" and that "grounds for judicial dissolution of the Corporation exist." (R. 46-1, Defs.' Mot., pp. 17-18.) While Defendants do not contend that there has been any change in the facts regarding EMC's status since 2005, Defendants appear to request the Court to reconsider their argument in the present motion because "the law has been materially clarified with respect to whether a defunct corporation may assert the privilege." *Id.* at 18. In support of this argument, Defendants cite *TAS Distrib. Co. v. Cummins Inc.,* 2009 WL 3255297, 2009 U.S. Dist. LEXIS 93750, *5-*6 (C.D. Ill. Oct. 7, 2009). In *TAS*, the court interpreted the Supreme Court's decisions in *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985) as follows:

> *Weintraub* itself does not decide the question whether a corporation's attorney client privilege survives the "death" of the corporation. A number of courts have, however, relied on *Weintraub's* reasoning to decide that question in the negative, ruling that a dissolved corporation does not have the right to assert the attorney-client privilege. *See, City of Rialto v. U.S. Dep't of Defense*, 492 F. Supp. 2d 1193, 1199 (C.D. Cal. 2007) (concluding that the special master correctly determined that a dissolved corporation may not assert the attorney-client privilege); *Gilliland v. Geramita*, No. 2:05-CV-01059, 2006 U.S. Dist. LEXIS 65546, 2006 WL 2642525, at *4, Sept. 14, 2006 (W.D. Pa.) (noting that "there should be a presumption that the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless a party seeking to establish the privilege demonstrates authority and good cause," and concluding that "counsel has no duty to assert the privilege on behalf of a non-functioning corporation"); *Lewis v. United States*, No. 02-2958B/AN, 2004 U.S. Dist. LEXIS 26680, 2004 WL 3203121, at *4, Dec. 7, 2004 (W.D. Tenn.) (concluding that the "attorney-client privilege cannot be applied to a defunct corporation" where the corporation "is bankrupt and has no assets, liabilities, directors, shareholders, or employees").
>
> ∗∗∗
>
> There is no binding authority cited by the parties or located by this Court, and any contrary authority predates *Weintraub* and is of limited viability. I find that the line of cases cited above is persuasive. Absent some compelling reason to the contrary, the attorney client privilege does not survive the death of the corporation. As the *Gilliland* Court noted, this interpretation of the privilege is "consistent with the principle that the attorney-client privilege should be given the narrowest interpretation consistent with its purpose. No real purpose would be served by continuing the privilege after operations cease, as the corporation would no longer have any goodwill or reputation to maintain." 492 F. Supp. 2d at 1200.

*Id.* at *5-*6. This citation alone, however, is an insufficient basis to grant a motion for reconsideration. The Seventh Circuit has made clear that a "basis for a motion to reconsider would be a controlling or significant

change in the law." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). However, "[s]uch problems rarely arise and the motion to reconsider should be equally rare." *Id.* That rare case is not presented here. There has been no *controlling* or *significant* change in the law since the filing of Defendants' initial motion to compel in 2005. Indeed, the 2009 case cited by Defendants is a non-controlling case that relies on cases pre-dating Defendants' initial motion and that does not address or apply Illinois law. While the amended complaint contains more detailed and some newly presented claims, Defendants could have presented the question of whether EMC is a defunct entity and whether that finding precludes EMC from asserting the attorney-client privilege in their earlier motion to compel. Defendants have accordingly waived this argument. *Bloch*, 587 F.3d at 784.

      **B.     The Court Will Not Consider Defendants' Argument that Former Directors May Access Privileged Communications Made When They Were Directors**

One of the primary arguments set forth by Defendants in their initial motion to compel was that "the privilege cannot be asserted against directors who received the legal advice." (R. 50-1, Case No. 04-2330, Bankruptcy Court for the Northern District of Illinois, pp. 3-4.) Defendants make this same argument in their present motion. (R. 46-1, Defs.' Mot., pp. 33-40.) Defendants offer three arguments to support their contention that the Court should reconsider this argument: (i) the amended complaint is significantly different than the initial complaint; (ii) the law has evolved since 2005; and (iii) Judge Black's 2005 ruling relied on inapplicable law and was wrongly decided. None of these arguments, however, is persuasive.

The Court agrees that EMC's amended complaint is significantly different from the initial complaint filed in 2004. While the initial complaint referenced many of the transactions that form the basis for the amended complaint, the amended complaint provides significantly more detail about these occurrences. In addition, the initial complaint contained claims for: (i) breach of fiduciary duty (failure to supervise); (ii) breach of fiduciary duty (affiliated party transactions); (iii) breach of fiduciary duty (gross mismanagement and corporate waste); (iv) aiding and abetting breach of fiduciary duty; (v) avoidance and recovery of fraudulent transfer – actual fraud; (vi) avoidance and recover of preferential transfer; and (vii) disallowance of claims. (R. 54-2, Ex. 1, Complaint.) The amended complaint contains claims for: (i) breach of fiduciary duties related to the adjacent properties' lease and purchase option; (ii) breach of fiduciary duty related to the French Hospital note; (iii) breach of fiduciary duties related to post-separation funds transfers from Northside to Permian; (iv) breach of fiduciary duty related to payments to Braddock management company for services to effect the Permian separation; (v) breaches of fiduciary duty related to new management contracts; and (vi) breaches of fiduciary duty related to Defendants' delay in discharging Rogan and failure to pursue indemnification from Rogan. (R. 54-2, Ex. 2, Amended Complaint.) Despite these differences, however, Defendants did not premise their argument in the initial motion to compel on the specific allegations contained in the complaint. Instead, Defendants argued that, "with respect to the alleged actions and inactions alleged in the Complaint, [Defendants] were advised by and acted in conformity with the advice they were given by lawyers that were simultaneously representing Edgewater, and the boards of directors of Edgewater, [Access], and [Vital]." (R. 50-1, Case No. 04-2330, Bankruptcy Court for the Northern District of Illinois, pp. 3.) Despite the fact that the amended complaint contains more detailed allegations than the initial complaint, the resolution of Defendants' argument turns not on the facts alleged, but instead the law as it relates to directors asserting the right to access to legal advice that they relied on to make decision on behalf of a corporation that is currently asserting attorney-client privilege. The legal issue remains the same.

Defendants also contend that, "since 2005 the law has evolved; the rationale for the doctrine has become clearer; and with it the fact there is no conceivable contradiction between it and other principles of Illinois law." (R. 46-1, Defs.' Motion, p. 34.) In support of this legal "evolution" argument, Defendants cite only two New York district court cases that post-date their 2005 motion to compel and both of which apply New York state law. As described in detail above, the Court will only reconsider an argument where "there has been a controlling or significant change in the facts since the submission of the issue to the court." *Orange*, 451 F. Supp. 2d at 961.

That is not the case here and the Court accordingly declines to readdress Judge Black's ruling regarding this issue based on an alleged evolution in the relevant law.

Finally, Defendants argue that the Court should reconsider Judge Black's ruling because Defendants dispute the reasoning and holding of *Dexia Credit Local v. Rogan*, 231 F.R.D. 268 (N.D. Ill. 2004), a case "apparently" relied on by Judge Black. This argument is without merit. First, Defendants do not explain why they waited over four years to raise this issue. Moreover, the Court disagrees that the *Dexia* opinion is patently "wrong." (R. 46-1, Defs.' Mot., pp. 35, 39.) In *Dexia*, Magistrate Judge Scheinkier, relying on *CFTC v. Weintraub*, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985) and *Hayes v. Burlington No. and Santa Fe Railway Co.*, 323 Ill. App. 3d 474, 752 N.E.2d 470, 473, 256 Ill. Dec. 590 (Ill. App. Ct. 2001), held that once an individual's "control group status" is terminated, "so too [is] his right of access to privileged documents of the corporation." *Dexia*, 231 F.R.D. at 277. (N.D. Ill. 2004). To distinguish *Dexia*, Defendants rely on dictum in a 1994 Illinois appellate court decision in which the court stated that "attorney-client privilege cannot be asserted against former CEO and Board Chairman since he was not an outsider, but within the class of people who would receive such communications." *SPSS, Inc. v. Carnahan-Walsh*, 641 N.E.2d 984, 267 Ill. App. 3d 586, 592 (Ill. App. Ct. 1994). No Illinois Court has since applied the reasoning in *SPSS* and another district court in this district affirmed Judge Scheinkier's ruling noting that the court "agree[d] with Judge Scheinkier's thoughtful analysis and prediction about what the Illinois Supreme Court would do in the face of a single citation in a single case by the Illinois Appellate Court many years ago." (Case No. 02-cv-8288, R. 177-1, 2/22/2005 Minute Order, pp. 1-2) (Filip, J.).

Defendants have accordingly failed to demonstrate that this Court should reconsider Judge Black's ruling regarding a director's ability to access privileged communications based on their status as former directors.

C. **Defendants' Argument that EMC Cannot Assert the Privilege for 1995-September 1998 and February 2000 Forward Is Untimely**

Defendants also argue that even if EMC has the right to assert the privilege against the Defendants, it cannot for the time periods of (i) 1995-September 1998 because third parties were present at the EMC board meetings when counsel delivered advice, and (ii) from February 2000 forward because counsel rendered the legal advice at issue to the boards of Access and Vital, not EMC. Defendants make no argument regarding why they failed to raise these arguments in their initial motion to compel which also sought privileged documents from this time period. The memorandum in support of their initial motion to compel reflects that Defendants recognized that the initial complaint covers the time period of 1994-2001 and that Defendants asserted that they sought access to the allegedly privileged documents because "with respect to the alleged actions and inactions alleged in the Complaint, [Defendants] were advised by and acted in conformity with the advice they were given by lawyers that were simultaneously represented Edgewater, and the boards of directors of Edgewater, [Access], and [Vital]." (R. 50-1, Case No. 04-2330, Bankruptcy Court for the Northern District of Illinois, p. 3.) Indeed, Defendants specifically sought unredacted versions of "board meetings, memorandum, meeting notes, and other materials" relating to the legal advice. *Id.* It is therefore clear that the arguments presented by Defendants in their current motion to compel regarding the board meetings from 1995-1998 were available to Defendants when they filed their initial motion to compel. In addition, because Defendants specifically referred to the communications with the boards of directors of Access and Vital in their earlier motion, the argument regarding communications from 2000 forward was also previously available to Defendants. The Court accordingly will not address this argument. *Bloch*, 587 F.3d at 784 ("any arguments . . . raised for the first time in [a] motion to reconsider are waived").

D. **EMC Has Waived the Attorney-Client Privilege With Respect to Certain Limited Documents by Placing These Documents "At-Issue" in the Amended Complaint**

Both parties devote the majority of their briefing to Defendants' argument that EMC has waived the attorney-client privilege by putting the advice it received from counsel "at-issue." While Defendants made this

same argument in their initial motion to compel and Judge Black rejected the argument in large part, the Court agrees that the issue is properly before the Court at this time. Whether EMC has waived the attorney-client privilege by placing the allegedly privileged communications "at-issue" turns on the allegations contained in the amended complaint.[1] While the subject matter of the initial and amended complaints remains largely the same, the addition of substantial detail and allegations to the amended complaint warrants reconsideration of this argument. *See Orange v. Burge*, 451 F. Supp. 2d at 961 (N.D. Ill. 2006) (motion for reconsideration proper where there has been a "controlling or significant change in the facts since the submission of the issue to the court").

EMC has conceded that it accordingly has put some of the legal advice received by Defendants at issue in its amended complaint and it has waived its attorney-client privilege with respect to those documents. (R. 46-4, Ex. 16, 9/16/2009 Letter from Counsel for EMC to Counsel for Defendants.) Defendants, however, assert that even where EMC has not disclosed privileged communications directly in the amended complaint, it has put the advice received by the various boards at issue as to every transaction in the amended complaint by asserting that the boards failed to use due care or to collect appropriate information in making their decisions. The parties agree that their dispute centers on the scope of the waiver.

In *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, the Illinois Supreme Court noted that "in the Federal decisional law, certain exceptions to 'absolute immunity' of opinion work product [are emerging]. One such exception, the 'at issue' exception, permits discovery of work product where the sought-after material is either the basis of the lawsuit or the defense thereof." 144 Ill. 2d 178, 199-200, 579 N.E.2d 322 (Ill. 1991). While the court did not find it necessary to apply the waiver in that case, the court noted that even if the work-product doctrine applied, the sought-after materials would still be subject to disclosure pursuant to the "at issue" exception. The court noted that "where, as in the underlying litigation, an attorney represents the common interests of two or more clients whose relationship later becomes adverse, and, in a subsequent action, the work product of the attorney is at issue," the work-product doctrine is not available "to bar discovery by one of the original parties." *Id.* at 200.

Since the Illinois Supreme Court's decision in *Waste Management*, a number of Illinois appellate courts have applied the "at issue" waiver doctrine to questions of attorney-client privilege. *See e.g., Shapo v. Tires 'N Tracks, Inc.*, 782 N.E.2d 813, 336 Ill. App. 3d 387, 394 (Ill. App. Ct. 2002) ("In Illinois, however, both the attorney-client privilege and the work-product privilege . . . may be waived as to a communication put 'at issue' by a party who is a holder of the privilege."). The scope of "at issue" waiver is limited. In *Western States Co. v. O'Hara*, for example, the Illinois appellate court held that where an insurer put at issue whether it had settled a claim in good faith, the insured was entitled to discovery of the insurers' communications with the law firm that represented the insurer during the settlement process. 357 Ill. App. 3d 509, 520-21 (Ill. App. Ct. 2005). In considering whether "the sought-after communications were placed 'at issue' or whether they [were] simply 'relevant to the dispute'" the court stated:

> To allow Western States to say only certain reasons and actions are at issue, while others may be kept secret, asks the court to find good faith on only part of the picture. Such an approach is manifestly unfair. By asking the court to find it exhausted the policy limits, Western States asks the court to find good faith, which can only be fairly determined based on the reasons and motives underlying that decision. The trial court did not err in ordering the documents relating to [Western States' attorneys] disclosed.

*Id.* at 520-21. Notwithstanding the importance of permitting disclosure of all communications necessary to evaluate the "reasons and motivation" relevant to a party's actions, given the import of attorney-client

---

[1] On April 30, 2010, prior to Defendants filing their reply in support of their motion to compel, EMC filed a second amended complaint in the adversary proceeding. Because the parties have focused their arguments in the motion and opposition on the allegations in the amended complaint, the Court will consider the arguments in relation to that filing.

confidence, it is also necessary for the court to ensure that only communications that are truly at issue in the litigation are disclosed:

> In this case, the core of the instant litigation is premised upon defendant's complaint that its former attorneys were not authorized to settle the case on its behalf. Therefore, defendant has placed the conduct of its former counsel at issue, and waiver is applicable to those earlier communications between it and its former counsel involving the settlement agreement, and the trial court did not abuse its discretion by allowing those communications to be disclosed. In fact, the court specifically stated that it would limit the testimony of the subpoenaed attorneys "as narrowly as we can to the specific issue regarding the circumstances surrounding the actual settlement agreement."

*Shapo*, 336 Ill. App. 3d at 394.

Based on the foregoing, is clear that the "at issue" waiver doctrine narrowly applies only when the privilege holder puts the communications directly at issue in the lawsuit. Indeed, in most cases where Illinois courts have applied the doctrine, the lawsuit involved allegations directly calling into question the "reasons and motivations" for a party's actions in an earlier lawsuit. That is not the case in the present litigation where EMC alleges that Defendants breached their fiduciary duties in a wide-ranging series of transactions. The Court therefore does not agree with Defendants' argument that "at issue" waiver encompasses legal advice as to every transaction at issue in the amended complaint. Defendants contend that "as a matter of basic fairness," the Court should find EMC's attorneys' advice at issue "since the fundament of all of EMC's accusations is that the decisions were made without due care." (R. 46-1, Defs.' Mot., p. 30.) In support, however, Defendants cite two indemnification cases that involved parties whose complaints set forth claims that specifically put legal advice at issue. As described above, in *Western States* the court held that the insurance company waived privilege regarding the earlier settlement because, under Illinois law, a settlement payment is deductible from the policy limit only if the insurer made the payment in good faith. 357 Ill. App. 3d at 520. Similarly, in *Abbott Labs. v. Alpha Therapeutic Corp.* the court held that because a provision of an indemnification contract requested the defendant to provide plaintiff with documentation demonstrating the legitimacy of its indemnification claim, by filing an indemnification claim the defendant put at issue whether the claim was based on its own negligence. 200 F.R.D. 401, 404-11 (N.D. Ill. 2000).

Conversely, in the adversary proceeding, EMC has filed suit against Defendants alleging breaches of fiduciary duty in six discrete instances. Defendants have not show that, as a matter of law, a claim alleging a breach of fiduciary duty necessarily implicates attorney-client communications. Moreover, Defendants do not explain their conclusory assertion that, "EMC is essentially seeking indemnification from the director defendants." (R. 46-1, Defs.' Mot., p. 31.) Keeping in mind the strictures of Illinois law regarding the "at issue" exception, the Court will accordingly address each count of the amended complaint in turn to determine whether EMC has placed privileged communications at issue.

### 1. Count I

Count I of the amended complaint alleges that Defendants breached their fiduciary duties to EMC by approving a multi-million dollar lease on terms that were disadvantageous to EMC. Specifically, the amended complaint alleges that Defendants Brewer, Chapas, and Fruland breached their fiduciary duties to EMC by: (i) approving a lease of properties adjacent to the hospital on terms overwhelmingly in favor of Rogan; (ii) delegating to Rogan, an interested party, the tasks of obtaining appraisals and presenting appraisal results to the board; (iii) failing to consider material information available to them; and (iv) approving the lease without reviewing it or discussing its terms. (R. 54-2, Ex. 2, ¶¶ 98-102.) The amended complaint alleges that Defendants Chapas, Brewer and Fruland further breached their fiduciary duties to exercise an option to purchase the adjacent properties by: (i) failing to investigate whether it was in the best interest of EMC to exercise the option; (ii) failing to consider material information available to them; (iii) entrusting to Rogan, an interested party, the lease-

purchase analysis; and (iv) failing to exercise the option. *Id.* at ¶¶ 124-128. Based on the allegations in the amended complaint, EMC only has placed the reasonableness of the business terms, and not the legal terms, of the lease at issue.

Although the amended complaint does not specifically put at issue any advice of counsel as it relates to the lease-purchase analysis, Defendants contend that EMC has nonetheless placed attorney-client communications regarding the decision at issue because the "terms were reviewed at least by EMC's general counsel at the time, Michael Olsen; in EMC's world, it would be impossible to ask Mr. Olsen if he thought it was a breach of duty for the Board to approve the lease, and if so, whether he told them that." (R. 46-1, Defs.' Mot., p. 29.) Mr. Olsen has already testified that he had no involvement in analyzing the financial implications of a purchase versus a lease, and that it was management's role to undertake that analysis. (R. 54-2, Ex. 13, p. 268). Indeed, Mr. Olsen's testimony suggests that his involvement was limited to the "legal issues" implicated by EMC's status as a non-profit, tax exempt entity. *Id.* Given that EMC has alleged that Defendants breached their fiduciary duties, in part, however, by failing to review the lease, Defendants should be permitted to inquire only as to the discrete issue of whether Mr. Olsen reviewed the lease and rendered any advice to Defendants regarding the terms of the lease. Any other inquiries are beyond the scope of what EMC has put at issue in Count I of the amended complaint.

### 2. Count II

Count II alleges that Defendants breached their fiduciary duties to EMC by: (i) approving a $10 million loan to an out-of-state hospital, French Hospital, (ii) failing to consider any benefit to EMC in making that decision, (iii) delegating responsibility for negotiating the loan to a board member with conflicting interests, and (iv) approving the loan without taking appropriate care to review its terms. (R. 54-2, Ex. 2, ¶¶ 130-165.) Count II further alleges that Illinois charitable trust law dictates that charities in Illinois should spend charitable dollars raised in Illinois on recipients located in Illinois. *Id.* at ¶ 135. The only reference to any communications with counsel in Count II is an allegation that the board considered a report from Mr. Olsen that he received an opinion from an investment banking firm that there "was a reasonable expectation of repayment of the note." *Id.* at ¶ 148. EMC has put only advice regarding repayment of this note at issue because it specifically alleges that Defendants "ratifi[ed] Rosenthal's action without even a basic understanding as to who would repay the Note." *Id.* at ¶ 161. Because EMC has put this communication at issue, Defendants are accordingly permitted to inquire as to whether Mr. Olsen expressed any opinion to the board regarding who would repay the note. In addition, because EMC has placed at issue whether Defendants breached Illinois charitable trust law, Defendants are entitled to disclosure of communications that specifically address any legal advice provided to the board regarding the impact of Illinois charitable trust law on the approval of the $10 million loan to French Hospital.

### 3. Count III

With respect to Count III, EMC agrees that certain statements or communications are at issue and that it has waived attorney-client privilege with respect to those statements. (R. 54-2, Ex. 16, September 16, 2009 Letter from Aizenberg to Hirshman.) Count III alleges that Defendants breached their fiduciary duties by approving a series of funds transfers to Permian after EMC separated from Permian on October 6, 1998. Specifically, EMC alleges that from October 6, 1998 through 2001, Defendants Brewer, Chapas and Fruland breached their fiduciary duties by approving: (i) an agreement to forgive $5 million of the note issued to French Hospital, (ii) an agreement to pay Permian $3 million for consulting services, and (iii) a $1 million gift to French Hospital. EMC agrees that it has put at issue the attorney-client communications that it contends "indicate[] that the EMC Board has the legal power to effectuate the separation from Permian without any transfers, gifts, contracts, or other concessions from [EMC] to Permian." (R. 54-1, EMC's Opp'n, p. 37.) Specifically, EMC states that it has put at issue Robert Hoban's advice: (i) that the EMC bylaws permitted the board alone to amend its bylaws and articles; (ii) regarding the legality of the actions the EMC board took to separate EMC from Permian; and (iii) that EMC's

directors must vote in the best interests of EMC even if those interests are not the same as Permian's interests. (R. 54-2, Ex. 16, p. 1.) Review of the amended complaint, however, reveals that EMC has put more than these discrete items of legal advice at issue.

With respect to the forgiveness of $5 million of the note issued to French Hospital, EMC alleges in the amended complaint that the EMC board "failed to exercise *any* care in the decision-making process" and it approved the agreement "without the benefit of a board meeting or any genuine discussion, analysis, or deliberation." (R. 54-2, Ex. 2, ¶ 182.) Significantly, EMC further alleges that the "[EMC] Board did not seek or obtain any legal advice or other professional guidance as to whether the loan forgiveness was consistent with the [EMC] Board's fiduciary obligations to [EMC] and/or Illinois' charitable trust law" and that had it done so, the [EMC] Board would have learned that "the large write down of the French Note was not well-grounded as a matter of law." *Id.* at ¶¶ 185-86. Based on these broad allegations, EMC's contention that it has only put the board's business decisions with respect to the write down of the French Hospital loan at issue is not persuasive. Instead, given that EMC has directly alleged that Defendants did not obtain legal advice as to whether the decision was consistent with their fiduciary duties and or Illinois' charitable trust law, it has put any legal advice that the Defendants did receive with respect to whether the French Hospital loan forgiveness was consistent with the board's fiduciary obligations and/or Illinois charitable trust law at issue and EMC is accordingly ordered to disclose any communications in this regard.

With respect to the agreement to pay Permian $3 million for consulting services and the $1 million gift to French Hospital, however, the amended complaint is generally devoid of any allegations placing legal advice with respect to those transactions at issue. Tellingly, in arguing that EMC's use of "at issue" waiver would "give the false impression that the attorneys said that the other steps for separation were not necessary . . . while preparing the very documents that implement those steps," Defendants only cite to allegations regarding the write down of the French Hospital note. (R. 46-1, Defs.' Mot, p. 23.) The amended complaint alleges that Defendants breached their fiduciary duties regarding this $3 million contract by: (i) approving the transaction without due care (including failing to request and obtain a professional opinion regarding the reasonableness of the consulting fees), (ii) disregarding that the services Permian would provide under the contract were duplicative of other services already provided to EMC, (iii) disregarding that the services to be provided by Permian were largely fictitious, (i) failing to conduct more than a limited review of the actual terms of the contract, and (v) failing to require interested board members to recuse themselves from voting on the contract. (R. 54-2, Ex. 2, ¶¶ 194-218.) With respect to the approval of a $1 million contribution to French Hospital, EMC alleges that Defendants breached their fiduciary duties by permitting the use of funds for purposes other than those that the EMC board had articulated and approving the contribution despite the fact that the transfer did not benefit EMC and instead drained its resources. *Id.* at ¶¶ 219-234. The only allegation with respect to these two transactions that implicates potential legal advice received by Defendants is the allegation that the $3 million gift to Permian was "clearly impermissible and in abrogation of [EMC]'s charitable mission in Illinois." *Id.* at ¶ 211. Because EMC has put legal advice with respect to this allegation at issue, the Court orders EMC to disclose any attorney-client communications regarding whether the $3 million gift was in compliance with Illinois charitable law.

These limited disclosures comport with the fact that Illinois "appellate decisions reflect an application of the at-issue doctrine that . . . properly balances the principle that 'waivers of the attorney-client privilege are to be narrowly construed, . . . and the principle that a party should not be able to selectively disclose privileged information that it believes works to that party's advantage while concealing the rest.'" *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 276 (N.D. Ill. 2004) (applying Illinois attorney-client privilege law).

### 4. Count IV

With respect to Count IV, EMC again concedes that certain statements or communications are at issue and that it has waived the attorney-client privilege with respect to those statements. (R. 54-2, Ex. 16, September 16, 2009 Letter from Aizenberg to Hirshman.) Count IV alleges that Defendants improperly approved over $1 million in payments to Rogan's management company for services that it purportedly provided in connection

with the separation of EMC from Permian. Count IV also contains detailed allegations regarding EMC's acquisition of Grant Hospital and the corporate reorganization that attended that acquisition. (R. 54-2, Ex. 2, ¶¶ 253-97.) EMC agrees that it has put at issue: (i) Robert Baudino's February 26, 1999 advice to the board regarding whether the Permian separation fell within Braddock's management agreement with EMC, whether Braddock could agree with EMC to additional compensation for activities performed, and a reasonable compensation that would be defensible under IRS regulations and how to calculate that amount; (ii) Baudino's May 5, 1999 advice that the fee negotiated with Braddock management company was appropriate and that the board performed its duties in accordance with IRS rules; and (iii) Robert Hoban and Robert Zimmerman's August 7, 1998 advice that the Grant Hospital acquisition was consistent with EMC's internal policies. (R. 54-2, Ex. 16, p. 2.)

With respect to Baudino's legal advice, Defendants argue that they are entitled to disclosure of all of his advice regarding the over $1 million in payments to Rogan's management company. EMC contends that Defendants have not identified any specific advice from their privilege log to which they seek access. In their reply, Defendants contend that "there clearly was an opinion letter prepared by Mr. Baudino, since the SAC complains extensively about what was wrong with it." (R. 58-1, Defs.' Reply, p. 20.) Neither the amended complaint nor the second amended complaint, however, refers explicitly to an opinion letter drafted by Baudino. Instead, they refer to the guidance Baudino issued to the board on February 26, 1999 and May 5, 1999 (R. 54-2, Ex. 2, ¶¶ 235-52), the very opinions that EMC has already agreed are at issue in this litigation. In short, Defendants argue that EMC has failed to disclose all of Baudino's opinions on this issue without identifying any of those opinions. Nonetheless, given Defendants' concern in this regard and their allegation that EMC has withheld communications from its privilege log, the Court orders EMC to provide an updated privilege log as it relates to Baudino's advice in Count IV only if EMC determines that it has omitted any relevant communications from the privilege log.

### 5. Count V

In Count V, EMC alleges that Defendants breached their fiduciary duties by approving management contracts with Rogan's management companies on terms disadvantageous to EMC. (R. 54-2, Ex. 2, ¶¶ 344-383.) EMC alleges that Defendants knew that Rogan's management companies and its senior executives, including Rogan, were the targets of a federal grand jury investigation. EMC further alleges that based on advice provided by David Stetler -- the board's counsel regarding criminal matters during the government's investigation of Rogan's management company -- recommending that Rogan retain his own attorney, Defendants should have known that Rogan was likely under investigation as well. *Id.* at ¶¶ 353-54. Based on this information, EMC alleges that Defendants breached their duty of due care by approving new management contracts with Rogan's companies. *Id.* at ¶¶ 355-57. EMC concedes that it has put at issue David Stetler's February 26, 1999 advice that the government had issued criminal investigative subpoenas to EMC, the FBI had visited Roger Ehmen at his home, and Rogan should seek separate counsel. (R. 54-2, Ex. 16, pp. 2.)

Defendants assert that they should be permitted to ask whether the lawyers who negotiated and drafted the agreements with Peter Rogan's management companies held the view that Rogan's company should not get the new contracts. Once again, however, Defendants have failed to identify any allegations in the amended complaint (or second amended complaint for that matter) in which EMC has put any legal advice with respect to those transactions at issue. The Court accordingly denies Defendants' motion to compel in this respect. *Cf. Fischel & Kahn*, 189 Ill. 2d at 585 (where defendant client placed attorney-client communications with plaintiff law firm at issue by filing a counterclaim for malpractice it did not follow that defendant client "waived the attorney-client privilege with respect to communications between it and its subsequent counsel").

### 6. Count VI

Finally, in Count VI, EMC alleges that Defendants violated their fiduciary duties as a result of their delay

in discharging Rogan's management company and failure to pursue indemnification from Rogan. (R. 54-2, Ex. 2, Amended Complaint.) EMC concedes in its response to Defendants' motion to compel that it has "waived the privilege for all of the legal advice Defendants received relating to these matters." (R. 54-1, EMC's Opp'n, p. 40.) The Court accordingly need not address this issue.

## II. Work Product Doctrine

Defendants fail to address the contention in EMC's response brief that Defendants have not raised any issues relating to the work-product doctrine with EMC as required by Local Rule 37.2. Indeed, Defendants' assertion that EMC has failed to provide sufficient detail in its privilege log reflects that, as EMC contends, the parties should address the work-product claims as required by Local Rule 37.2 so that they can be "sufficiently crystallized before this Court decides them." (R. 54-1, EMC's Opp'n, p. 52.) This is especially imperative given that the law governing the work product doctrine differs from the law governing attorney-client privilege. *See Fischel & Kahn*, 189 Ill. 2d at 591 ("The work product doctrine provides a broader protection than the attorney-client privilege and is designed to protect the right of an attorney to thoroughly prepare his case and to preclude a less diligent adversary attorney from taking undue advantage of the former's efforts."); *see also Waste Management,* 144 Ill. 2d at 189 (the "attorney-client privilege and work product" doctrine are "separate and distinct protections and waiver of one does not serve as waiver of the other").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to compel. EMC is required to disclose the following communications to Defendants by July 27, 2010:

- Communications from Mr. Olsen to Defendants, if any, regarding whether Mr. Olsen reviewed the lease referenced in Count I of the amended complaint and rendered any advice to Defendants regarding the terms of the lease;
- Communications from Mr. Olsen to Defendants, if any, regarding who would repay the note issued to French Hospital referenced in Count II of the complaint;
- Communications from counsel to Defendants, if any, regarding the impact of Illinois charitable trust law on the approval of the $10 million loan to French Hospital referenced in Count II of the amended complaint;
- Communications from counsel to Defendants, if any, regarding whether their decision to write down the French Hospital loan referenced in Count III of the amended complaint was consistent with the board's fiduciary duties and/or Illinois charitable trust law; and
- Communications from counsel to Defendants, if any, regarding whether the $3 million gift to Permian referenced in Count III of the amended complaint was in compliance with Illinois charitable law.

The Court further orders EMC to provide an updated privilege log to Defendants by July 27, 2010 as it relates to Mr. Baudino's advice referenced in Count IV of the amended complaint if EMC determines that it has omitted any relevant communications from the privilege log.